Baldi v. Amadon, et al.             CV-02-313-M    04/05/04
UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


<u>John A. Baldi</u>,
    Plaintiff

    v.                            Civil No. 02-313-M
                                  Opinion No. 2004 DNH 055
<u>Roger W. Amadon, Henry Farrin,</u>
<u>Frank Cassidy, Eric Bourn,</u>
<u>James MacKenzie, Paul Pearson,</u>
<u>John Hickey, Peter Bosiak,</u>
<u>and Laurance Yeaton</u>,
    Defendants


**O R D E R**


Nine counts asserted against various combinations of defendants remain in this case. Before the court is James MacKenzie's Motion for Summary Judgment on the only remaining counts against him: Count VIII (asserting a Fourth Amendment violation), Count XVII (asserting a conspiracy to violate N.H. Rev. Stat. Ann. § 570-A:2), Count XXI (asserting a conspiracy to invade his privacy), and Count XXV (asserting negligence for defendant's failure to tag a deer in plaintiff's yard). Plaintiff objects. For the reasons given below, MacKenzie's motion is granted.

**Summary Judgment Standard**

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)). "The role of summary judgment is to pierce the boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trial-worthy issue exists." Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving party to present evidence showing the existence of a trialworthy issue." Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st Cir. 2004) (citing Anderson, 477 U.S. at 248; Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). To

2

meet that burden, the nonmoving party may not rely on "bare allegations in [his or her] unsworn pleadings or in a lawyer's brief."  Id. (citing Rogan v. City of Boston, 267 F.3d 24, 29 (1st Cir. 2001); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).  When ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)).

## Background

The general factual background of this case has been set out in considerable detail in an order dated June 9, 2003 (document no. 63), and is not repeated here.  The specific factual background relevant to Count VIII, viewed in the light most favorable to plaintiff, is as follows.

James MacKenzie is a conservation officer employed by the New Hampshire Department of Fish and Game. On four occasions,[1] he conducted nighttime surveillance of plaintiff's property, from a vantage point on a neighbor's land.[2] (Def.'s Mot. Summ. J., Ex. A (MacKenzie Aff.) ¶¶ 6-7.) According to MacKenzie, his vantage point was approximately 150 yards from Baldi's house. (MacKenzie Aff. ¶ 7.) On July 4, 1999, MacKenzie used a night scope to observe Baldi's open fields. (MacKenzie Aff. ¶¶ 10-11.) While scanning Baldi's fields, he also looked at Baldi's house. (MacKenzie Aff. ¶¶ 11-12.) MacKenzie "do[es] not recall seeing anything looking at the house that [he] would not have seen without the night scope" (MacKenzie Aff. ¶ 11), and he "recall[s] that on July 4, 1999 the house was dark and it appeared that

---

[1] November 24, 1993, November 6 and 7, 1998, and July 4, 1999. (Def.'s Mot. Summ. J., Ex. D.)

[2] Baldi contends that MacKenzie "must" have conducted his surveillance from a point on his property because MacKenzie could not have seen into his residence from the spot marked on defendant's Exhibit C, which MacKenzie claims to have been his vantage point. However, the physical impossibility of seeing into Baldi's residence from the spot marked on defendant's exhibit, even if proven, does not, as a logical matter, place MacKenzie on Baldi's property unless it is impossible to see Baldi's residence from any location outside his property, an assertion Baldi has neither made nor supported with evidence. In other words, the alleged inconsistency Baldi identifies does not concern a material fact.

there was no one at home" (MacKenzie Aff. ¶ 12).  MacKenzie's

daily calendar for July 4, 1999, contains the following relevant

entries:

    met w/250 on Baldi - shooting deer - Gave him Paperwork

    - worked Baldi w/253 at Night

    [REDACTED]

    - Picked up Nightscope Region III

(Def.'s Mot. Summ. J., Ex. D.)  MacKenzie's calendar entries do

not indicate what MacKenzie saw through the night scope on July

4.


    In an attempt to avoid summary judgment, Baldi has

testified, by affidavit, as follows:

        The affidavit of defendant MacKenzie, submitted
    with his motion for summary judgment, is not truthful.
    The distance from my family residence to where his X is
    on exhibit C is a minimum of 300 yards as shown on the
    United States Geological Survey Map of 1998.
    Furthermore, it is not physically possible for a person
    standing on the ground to see the Baldi family home or
    either of the two hay fields owned by the Baldi's, from
    the location marked with an X by MacKenzie.  The Baldi
    property all slopes to the west, the field MacKenzie
    was in slopes to the east (very slightly) and the
    cresting point is in the middle on the property then
    owned by Raymond Dow and his wife.  In addition, the

5

Barn of the Dow's and the grove of thickly planted spruce trees at the top of the steep slope coming up from their farm pond, extends the full width of their property. These trees are approximately 25-30 feet tall, heavily branched all the way to the ground, and planted so closely together that if one were standing on one side of the grove he could not see through it to view anything on the other side of the grove. Also, the angle of the Baldi home as shown on the USGS map, depicts that MacKenzie could not have seen into the back of the structure where the one room used by the plaintiff is located, unless he was on Baldi property. He has confirmed in his daily report that the Plaintiff was home, it was late at night and Mr. Baldi was in bed, so he had to be looking through the window of the Plaintiff's room with the night-vision goggle he admits to have been using.

(Pl.'s Obj. to Summ. J., Ex. 11 (Baldi Aff.) ¶ 8.)

## Discussion

MacKenzie moves for summary judgment on Count VIII on grounds that: (1) the statute of limitations has run on all but the July 4, 1999, surveillance episode; (2) he never entered Baldi's residence or curtilage or observed those areas from an unprivileged vantage point; and (3) his use of a night scope did not transform his surveillance into an unreasonable search. Plaintiff counters that MacKenzie must have had a vantage point different from the one marked on Exhibit C of his Motion for Summary Judgment because: (1) his residence is 300 yards from

6

that point, rather than 150, and not visible from the point marked on Exhibit C; and (2) it is impossible to look into the back room of his residence from any vantage point not located on his property. Plaintiff also appears to argue that the mere fact that MacKenzie looked at his residence with a night scope[3] is sufficient to establish a Fourth Amendment violation. He is mistaken.

-------

[3] At some points, plaintiff seems to claim that MacKenzie violated his Fourth Amendment rights by looking <u>into</u> his residence, with night vision equipment, to determine that he was home on the evening of July 4, 1999, while at other points, he appears to assert that MacKenzie invaded his curtilage, and thus violated his Fourth Amendment rights, merely by looking <u>at</u> his house with night vision equipment. Plaintiff's claim that MacKenzie looked into his residence rests upon an assertion that MacKenzie's own reports "state that Baldi was home," (Pl.'s Obj. to Def.'s Mot. Summ. J., ¶ 2), and an argument that MacKenzie could not have known that he was home without seeing him, asleep, inside his house. However, Baldi has not submitted a copy of the report in which MacKenzie is purported to have stated that Baldi was at home; the calendar sheets submitted by MacKenzie contain no such statement; and in his affidavit, MacKenzie testified that "on July 4, 1999 the house was dark and <u>it appeared that there was no one at home</u>." (MacKenzie Aff. ¶ 12 (emphasis added).) Thus, the record contains no evidence from which a reasonable jury could conclude that MacKenzie ever looked into Baldi's residence. Accordingly, Baldi's Fourth Amendment claim is limited to an assertion that MacKenzie violated his constitutional rights by looking at the outside of his residence with a night scope.

Plaintiff's Fourth Amendment claim rests, to a substantial degree, on the Supreme Court's decision in Kyllo v. United States, 533 U.S. 27 (2001). In that case, the Court held that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' constitutes a search – at least where (as here) the technology in question is not in general public use." Id. at 34 (emphasis added) (quoting Silverman v. United States, 365 U.S. 505, 512 (1961)).

Kyllo was a criminal case in which a government agent scanned a suspect's home with a thermal imager and discovered "that the roof over the garage and a side wall of [the suspect's] home were relatively hot compared to the rest of the home and substantially warmer than neighboring homes in the triplex." Kyllo, 533 U.S. at 30. Based upon those thermal anomalies, the agent "concluded that [the suspect] was using halide lights to grow marijuana in his house." Id. Relying in part upon the data from the thermal scanning, the agent got a search warrant, searched the suspect's home, and discovered a large indoor

marijuana growing operation. Id. Before trial, the defendant moved, unsuccessfully, to suppress the evidence seized from his home. Id. Ultimately, the Supreme Court sided with the defendant, ruling that use of the thermal imager was an unreasonable search because it revealed information about the interior of the home that could not have been obtained otherwise. Id. at 34.

Here, plaintiff's Fourth Amendment claim is limited to MacKenzie's viewing of the exterior of Baldi's residence with a night scope; Baldi has failed to produce any evidence from which a jury could conclude that MacKenzie ever looked inside the residence. Moreover, unlike the suspect in Kyllo, Baldi has produced no evidence from which a jury could conclude that: (1) MacKenzie obtained any information regarding the interior of his home by using the night scope; or (2) that it is even possible to obtain information about the interior of a building by viewing its exterior through a night scope; or (3) that using the night scope allowed MacKenzie to see something inside that he could not have seen simply by looking from a point that did not involve a physical intrusion into a constitutionally protected area.

According to MacKenzie's unchallenged affidavit testimony, the night scope he used amplifies ambient light but "would not assist in any way in seeing the interior of a lighted building." (MacKenzie Aff. ¶ 11.)  Thus, MacKenzie's night scope is fundamentally different from the thermal imager in Kyllo, which did not amplify light available outside a building, but, rather, detected heat generated inside a building.  533 U.S. at 29-30; see also People v. Deutsch, 52 Cal. Rptr. 2d 366, 367 n.1 (Cal. Ct. App. 1996) (citation omitted) ("The thermal imager differs from infrared devices (such as night vision goggles) in that the latter amplify the infrared spectrum of light whereas the thermal imager registers solely that portion of the infrared spectrum which we call heat.").  In other words, the undisputed factual record demonstrates that the night scope MacKenzie used did nothing more than allow him to see, at night, what he would have been able to see, without any technological assistance, in the daylight.  Moreover, while Baldi relies heavily on Kyllo, a thermal imager case, he has cited no case in which a court has held that surveillance with a night scope constitutes a Fourth Amendment search.

10

Because MacKenzie did not look at Baldi's house with a device that was capable of providing him with "information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,'" Kyllo, 533 U.S. at 34, MacKenzie's surveillance did not constitute a search for Fourth Amendment purposes. In the absence of a search, MacKenzie is entitled to judgment as a matter of law on Count VIII. Furthermore, because Count VIII is the only remaining federal claim against MacKenzie, the court declines to exercise supplemental jurisdiction over Counts XVII, XXI, and XXV, which assert state-law claims. See Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).

## Conclusion

For the reasons given above, MacKenzie's motion for summary judgment (document no. 74) is granted. Accordingly, the case will proceed on Counts I, III, VIII (against defendants Amadon, Farrin, Cassidy, Bourn, and Pearson only), XV, XVI, XVII (against defendants Farrin, Cassidy, Bourn, Hickey, Bosiak, and Yeaton only), XVIII, and XXI (against Farrin and Cassidy only).

11

**SO ORDERED.**


                                     _____
Steven J. McAuliffe
United States District Judge

April 5, 2004

cc:   John A. Baldi
      Edward J. Barshak
      Donald E. Gardner, Esq.
      Paul A. Maggiotto, Esq.
      Nancy J. Smith, Esq.